Jeffrey A. Milman, Esq., SBN 99072
Benjamin T. Ikuta, Esq., SBN 260878
HODES MILMAN, LLP
9210 Irvine Center Drive
Irvine, California 92618
T: (949) 640-8222
F: (949) 336-8114
jmilman@hodesmilman.com
bikuta@hodesmilman.com

Attorneys for Plaintiff,
LONNY S. BLANK

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| LONNY S. BLANK,<br><br>    Plaintiff,<br><br> vs.<br><br>DEPUY ORTHOPAEDICS, INC., an Indiana corporation, DEPUY, INC, an Indiana corporation, JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., a New Jersey corporation, THOMAS P. SCHMALZRIED, M.D., an individual, THOMAS P. SCHMALZRIED, M.D., A PROFESSIONAL CORPORATION, an individual, and DOES 1 through 20, inclusive,<br><br>    Defendants. | Case No.:<br><br>_Assigned for all purposes to:_<br>Judge<br>Dept<br><br>**COMPLAINT FOR:**<br><br>**(1) STRICT PRODUCT LIABILITY,**<br>**(2) NEGLIGENCE,**<br>**(3) BREACH OF IMPLIED WARRANTIES,**<br>**(4) BREACH OF EXPRESS WARRANTY, and,**<br>**(5) BREACH OF SONG-BEVERLY CONSUMER WARRANTY ACT**<br><br>**JURY TRIAL DEMANDED**<br><br>Complaint Filed:<br>Trial date:  N/A |

Plaintiffs LONNY S. BLANK ("Plaintiff"), allege on information and belief against DEPUY ORTHOPAEDICS, INC., an Indiana corporation, DEPUY, INC., an Indiana corporation, JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., a New Jersey corporation, THOMAS P. SCHMALZRIED, M.D. (an individual), THOMAS P. SCHMALZRIED, M.D. A PROFESSIONAL CORPORATION, AND DOES 1 through 20, inclusive, ("Defendants"), the following:

**INTRODUCTION AND SUMMARY OF ACTION**

1. Since 2002, Defendants have known that their hip replacement device - the Pinnacle® Acetabular Cup System (hereinafter the "Pinnacle Hip") - is prone to fail within approximately two years of implantation despite the fact that such hip implant devices are designed to last more than fifteen years. They have also known that the implant's metal "ball" and "socket" bearings that make up the hip-joint generate metal debris over time from wear and tear that can spread throughout the patient's surrounding bone and tissue. As a result of these defects, patients that have had the devices implanted have endured, or will endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation causing damage or death to surrounding tissue and bone; and a subsequent more difficult revision surgery to replace the faulty devices giving rise to more debilitation, a prolonged recovery time, and an increased risk of complications and death from surgery. But rather than immediately recalling the Pinnacle Hip Devices upon first receiving notice in 2002 of complaints made to the U.S. Food & Drug Administration ("FDA") and receiving direct notice of the defects discussed above, Defendants continued to aggressively market the Pinnacle Hip Devices, claiming that that they were a safe and effective hip replacement system.

2. Plaintiff's suffering could easily have been prevented. Plaintiff and those like him would not have suffered from unnecessary pain and debilitation had Defendants warned the public of the dangers of the Pinnacle Hip Implant Devices after 2002 when dozens of complaints began being made both to the Defendants and to the FDA regarding the device's failures. Or, even better, would have been if Defendants had taken the affirmative step of recalling the Pinnacle Hip Implant Devices at that time, as opposed to continuing to aggressively market the Pinnacle Hip Implant Devices. But Defendants' failure to recall these devices places on thousands of Americans, including Plaintiffs, the burden of living with the consequences of these faulty devices for years, if not the rest of their lives. Plaintiffs seek redress for his injuries.

**PARTIES**

3. Plaintiff LONNY S. BLANK is a citizen of the State of California and resides in Tustin, California.

4. On information and belief, Defendant DEPUY ORTHOPAEDICS, INC., and DEPUY, INC., (collectively "DePuy") are corporations organized and existing under the laws of Indiana with their

COMPLAINT FOR DAMAGES AND JURY DEMAND

primary place of business in Warsaw, Indiana. DePuy designed, manufactured, and sold the Pinnacle Hip Implant Device that is the subject of this lawsuit.

5.   On information and belief, Defendant JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC. ("J&J") is a corporation organized and existing under the laws of New Jersey with its primary place of business in New Brunswick, New Jersey.  J&J designed, manufactured, and sold the PINNACLE Hip Implant Device that is the subject of this lawsuit.

6.   On information and belief, Defendant THOMAS P. SCHMALZRIED, M.D., A Professional Corporation ("TPS Corp.") is a corporation organized and existing under the laws of California with its primary place of business at 2200 W. Third St., Suite 400, in Los Angeles, California. TPS Corp. designed the hip implant that is the subject of this lawsuit. TPS Corp. collects royalties for each hip implant sold.

7.   On information and belief, Defendant THOMAS P. SCHMALZRIED, M.D. ("Schmalzried, M.D.") is a resident of the State of California. He personally designed the hip implant that is the subject of this lawsuit. He along with TPS Corp. collects royalties for each hip implant sold.

8.   On information and belief, Defendant THOMAS P. VAIL, M.D., ("Vail, M.D.") is a resident of the State of California. He personally designed the hip implant that is the subject of this lawsuit. He collects royalties for each hip implant sold.

9.   The true names and capacities of Does 1 through 20 are unknown to Plaintiffs. Plaintiffs are informed and believe and thereon allege that each of these Defendants are in some way liable for the events referred to in this Complaint and caused damage to Plaintiffs. Plaintiffs will amend this Complaint and insert the correct names and capacities of those Defendants when they are discovered.

10.   At all times mentioned each of the Defendants-including DOES 1 through 20-was the representative, agent, employee, joint venturer, or alter ego of each of the other defendants and in doing the things alleged herein was acting within the scope of its authority as such.

11.   DePuy, J&J, and DOES 1 through 20 are collectively referred to herein as "Defendants."

## FACTUAL BACKGROUND

**A.   The DePuy Pinnacle ® Acetabular Cup System is Defective, Unsafe and Has Not Been Adequately Tested**

12.   The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis. The hip joint is often characterized as a ball and socket joint.  The acetabulum is the cup shaped socket portion of the hip and the femoral head (ball) at the top of the femur bone rotates within the curved surface of the acetabulum.

13. A total hip system replaces the body's natural joint with an artificial one, usually made out of metal, plastic, or ceramic. A typical hip replacement system consists of four separate components: (1) a femoral stem, (2) a femoral head, (3) a liner (bearing surface), and (4) an acetabular shell. After the surgeon hollows out a patient's femur bone, the metal femoral stem is implanted. The femoral head is usually a metal ball that is fixed on top of the femoral stem. The femoral head forms the hip joint that can rotate when it is placed inside a plastic, ceramic, or metal liner that is attached to the interior portion of the metal acetabulum cup (socket) comprised of metal on its outer shell. When complete, the femoral stem anchors the metal femoral head that rotates within the liner sitting inside the acetabular cup.

14. Defendants developed, designed, tested, manufactured, distributed, and sold the Pinnacle Hip, which is a hip bearing system to be used in a total hip replacement or revision surgery. The Pinnacle Hip system includes two component parts: the liner and acetabular cup. Defendants developed, designed, tested, manufactured, and distributed at least four different metal acetabular cups and three different liners to be used as the Pinnacle Hip. The acetabulum cup is comprised of titanium metal on its outer shell and can be fixed to the bone with screws or without screws by growing into the bone with Defendants Gripton™ porous technology. The Pinnacle Hip has three different liners to choose from made of cobalt-chromium metal, polyethylene plastic or ceramic. One of the cobalt-chromium metal liners is the Ultamet® XL.

15. The Pinnacle Hip is critically different than most hip replacements since it uses a metal acetabular liner instead of a polyethylene plastic acetabular liner. The Pinnacle Hip with a metal liner, such as the Ultamet® XL, is a "metal-on-metal" device due to the fact that both articulating surfaces - the femoral head (ball) and acetabulum liner (socket) - are comprised of cobalt-chromium (CoCr) metal. Therefore, the metal-on-metal design forces metal to rub against metal with the full weight and pressure of the human body creating metallic debris to be released into the Plaintiff's hip socket and blood stream. Because of Defendants' defective design for the Pinnacle Hip, hundreds of patients--including Plaintiff-- have been forced to undergo surgeries to replace the failed hip implants.

16. Defendants describe the Pinnacle Hip as "the only product available that provides the option of choosing a polyethylene or metal insert for use with the same outer titanium cup that replaces the socket of the natural hip."

4

_____
COMPLAINT FOR DAMAGES AND JURY DEMAND

17. Defendants developed, designed, tested, manufactured, and distributed the metal and ceramic femoral heads that are used with the Pinnacle Hip that directly contact the liner. The Articul/eze-M Spec Femoral Head and the aSphere M-Spec Femoral Head are metal femoral heads commonly used with the Pinnacle Hip.

18. The Pinnacle Hip is fully compatible with DePuy's complete line of advanced femoral stems that Defendants develop, design, test, manufacture, and distribute such as the AML®, Prodigy®, Summit™, Corail®, Tri-Lock®, and S-ROM femoral stems and sleeves.

19. The Pinnacle Hip is a Class III medical device. Class III devices are those that operate to sustain human life, are of substantial importance in preventing impairment of human health or pose potentially unreasonable risks to patients.

20. The Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938 ("MDA"), in theory, require Class III medical devices, including the Pinnacle Hip, to undergo premarket approval by the FDA, a process which obligates the manufacturer to design and implement a clinical investigation and submit the results of the investigations to the FDA.

21. Premarket approval is a rigorous process that requires a manufacturer to submit what is typically a multivolume application that includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a full statement of the device's components, ingredients, and properties, and of the principle or principles of operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device; samples or device components required by the FDA; and a specimen of the proposed labeling.

22. The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

23. A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device – was not required to undergo premarket approval.

24. In addition, a medical device marketed after the MDA's effective date may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a pre-MDA device (i.e., a device approved prior to May 28, 1976). This exception to premarket approval is known as the "510(k)" process and simply requires the manufacturer to notify the FDA under section 510(k) of the

MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then approve the new device for sale in the United States.

25. The MDA does not require an FDA determination that the device is in fact, substantially equivalent to a grandfathered device.

26. Instead of assuring the safety of the Pinnacle Hip through clinical trials, Defendants sought to market the Pinnacle Hip without conducting any clinical trials by obtaining FDA approval under section 510(k). To that end, Defendants submitted a section 510(k) premarket notification of intent to market the Pinnacle Hip.

27. By telling the FDA that the Pinnacle Hip's design was "substantially equivalent" to other hip components and products on the market, Defendants were able to avoid the safety review required for premarket approval under FDA regulations including clinical trials.

28. The FDA cleared the Pinnacle Hip for sale by means of the abbreviated 510(k) process and consequently the FDA did not require the Pinnacle Hip to undergo clinical trials.

29. The 510(k) notification for the Pinnacle Hip includes Defendants assertion that it believes the Pinnacle Hip to be substantially equivalent to devices that had never been reviewed for safety and effectiveness.

30. Significantly, unlike the premarket approval process, the 510(k)-notification process does not call for scrutiny – or even clinical testing – of a device's safety and effectiveness.

31. A finding of substantial equivalence is not equivalent to a finding of a device's safety and effectiveness.

32. Thus, the FDA's finding of "substantial equivalence" had nothing to do with reviewing the Pinnacle Hip's safety and effectiveness, but rather only a determination of equivalence to devices that they underwent no safety and effectiveness review.

33. Defendants sold approximately 150,000 Pinnacle Hips.

**B.     Defendants Have Continued to Market the Pinnacle Hip Despite Over 1,300 Reported Adverse Events – As Such, Defendants Should Have Recalled Or Notified The Public and Health Care Industry of The Defective Problems.**

34. Defendants have received over 1,300 reports associated with the Pinnacle Hip since 2002, and the number is expected to grow. From January 1, 2011 to March 31, 2011, the FDA received over

250 self-reported adverse events regarding the Pinnacle Hip (metal-on-metal). Reported symptoms range from pain, infection, inflammation, feeling as if dislocating, heavy metal poisoning (metallosis) confirmed by blood tests resulting in eventual revision, ALVAL fluid (Aseptic Lymphocytic Vasculitis Associated Lesion) and necrotic tissue in and around the hip joint, catastrophic failure, premature wear, disarticulation, and disassembly.

35. In May 2002, shortly after Defendants began selling the Pinnacle Hip, Defendants received two complaints. One reported that a patient had to undergo revision surgery to remove and replace the Pinnacle Hip because the liner disassociated with the cup and another reported revision surgery because the acetabular cup had loosened. DePuy closed their investigation of the filed complaints finding that "corrective action is not indicated."

36. Defendants have continued to receive hundreds of similar complaints since 2002 reporting that the Pinnacle Hip had failed and forced patients to undergo painful and risky surgery to remove and replace the failed hip. By June 2006, Defendants received 50 complaints related to the Pinnacle Hip.

37. Consequently, Defendants were fully aware that the Pinnacle Hip was defective and that dozens of patients already had been injured by the Pinnacle Hip. Based on this information, Defendants should have recalled the Pinnacle Hip in 2006. At a minimum, Defendants should have stopped selling the defective implant when it became aware that it had catastrophically failed in patients. Over the next two years patients continued to report failures of the Pinnacle Hip. By the end of 2008, Defendants received more than 430 reports, and by the end of 2009, that number skyrocketed to almost 750.

38. Had Defendants conducted clinical trials of the Pinnacle Device before it was first released on the market in the early 2000's, they would have discovered at that time what they ultimately learned in and around 2007 - that the Pinnacle Hip results in a high percentage of patients developing pain, metallosis, biologic toxicity and an early and high failure rate due to the release and accumulation of metal particles in the patient's surrounding tissue when there is friction (wear or edge-loading) of the cobalt-chromium metal femoral head that rotates within the cobalt-chromium metal acetabular liner.

39. The metallic particulates released by friction of the metal-on-metal surfaces can become toxic causing metallosis or cobaltism giving rise to pseudotumors or other conditions. The formation of metallosis, pseudotumors, and infection and inflammation causes severe pain and discomfort, death of surrounding tissue and bone loss, and a lack of mobility.

40. Despite the knowledge of the Pinnacle Hip's defect and that it had failed hundreds of times; causing hundreds of patients to undergo the agony of another surgery, Defendants continued to market and sell the defective Pinnacle Hip implant. In so doing, DePuy actively concealed the known defect from doctors and patients-- including Plaintiff and his doctor--and misrepresented that the Pinnacle Hip was a safe and effective medical device.

41. Despite knowledge by these Defendants, Defendants failed to warn medical providers and/or their customers of the unreasonable dangers associated with the Pinnacle Hip and allowed for the continued sale and installation into patients' bodies.

42. To this day, Defendants continue to sell the defective Pinnacle Hip to unsuspecting patients without any warning about the risks or the failures that have been reported over the years.

43. Defendants tout the metal-on-metal Pinnacle Hip in brochures saying "the DePuy metal-on-metal (MoM) articulation system is leading the way in advanced technology. Through years of careful engineering, research and expertise, we've created a total hip replacement solution that offers low wear and high stability.1"

44. Defendants claim "DePuy Orthopaedics remains the leader in metal-on-metal technology, offering several advantages, including larger diameter bearings that can improve hip range of motion and stability. In fact, one study conducted since the device was approved in 2002 observed that an estimated 99.9 percent of Pinnacle Hip components remain in use.2"  One of the Pinnacle Hip designers William P. Barrett, MD, of Valley Orthopaedic Associates/Proliance Surgeons in Renton, WA has been quoted in Defendants marketing materials saying "the Pinnacle cup exhibited 99% survivorship at five years and, significantly, differences between patients, surgeons, femoral stems, head size, and articulation types did not affect survival."

45. Defendants advertised that "only Pinnacle Hip Solutions feature TrueGlide™ technology, allowing the body to create a thin film of lubrication between surfaces. The result is a smooth, more fluid

---

[1] "Advancing High Stability and Low Wear" Brochure; The study was presented at the AAOS 2007 Annual Meeting by at least one of the Pinnacle Hip designers, William P. Barrett, (Kirk Kindsfater, William Barrett, James Dowd, Carleton Southworth, Marilyn Cassell. Poster #P077, "Midterm Survival of the Pinnacle Multi-Liner Acetabular Cup in a Prospective Multi Center Study," 2007 AAOS Annual Meeting.)
[2] http://www.depuy.com/healthcare-professionals/product-details/pinnacle-acetabular-cup-system-48mm-66mm

1 range of natural motion." Defendants distributed a press release stating "the aSphere head, combined with DePuy's exclusive TrueGlide technology, facilitates a more fluid range of natural motion and up to 159 degrees range of motion."

46. Defendants advertised that "the Pinnacle™ Acetabular Cup System is DePuy's premium product for acetabular indications and can address all existing pathologies."

47. Defendants advertised that "for the first-time surgeons have the choice between high performance bearings which all work within the Pinnacle™ Acetabular Cup System."

48. Other Pinnacle Hip advertisements and brochures included pictures of a man on the beach in a wet suit carrying a surfboard and a man playing tennis (which specifically describes him as a bilateral replacement). There are pictures of women stretching outside before a job or yoga, and a woman riding a stationary bike.

49. Defendants marketed the Pinnacle Hip as high-performance hip replacements and as superior products that would allow patients to return to their more active lifestyles. Defendants also advertised that the Pinnacle Hip would last longer than other hip replacement products.

50. A number of governmental regulatory agencies have recognized the problems that are caused by metal-on-metal implants such as the Pinnacle Hip. For instance, The Medicines and Healthcare Products Regulatory Agency ("MHRA") in Britain investigated Defendants' metal-on-metal total hip replacement system after receiving widespread reports of soft tissue reactions and tumor growth in thousands of patients who had received these implants. MHRA has required physicians to establish a system to closely monitor patients known to have metal-on-metal hips by monitoring the cobalt and chromium ion levels in their blood and to evaluate them for related soft tissue reactions.

51. Similarly, the Alaska Department of Health recently issued a bulletin warning of the toxicity of Defendants' metal-on-metal total hip replacement systems. The State of Alaska, like the MHRA, identified the need for close medical monitoring, surveillance and treatment of all patients who had received these and similar metal-on-metal implants.

52. Defendants have known for years that implantation of their Pinnacle Hip and other metal-on-metal total hip replacement systems results in metallosis, biologic toxicity and an early and high failure rate. Once the body is exposed to and absorbs the toxic metallic ions and particulate debris from

the Pinnacle Hip, inflammation occurs, causing severe pain, necrosis (death) of the surrounding tissue and bone loss. Pseudotumors also develop and grow as a direct and proximate result of the toxic metallic particles and ions released from the metal-on-metal hip components.

53. There is no non-surgical solution for elevated cobalt levels.

### C. Mr. Blank's Pinnacle Hip Implant Device Was Defective

54. On March 29, 2004, Mr. Blank underwent a total right hip arthroplasty with the Pinnacle Hip Implant Device.

55. Before May 2007, Defendants were on notice that the Pinnacle Hip Implant Device was defective, but they failed to disclose this information to Mr. Blank, his physicians, or the public.

56. Following his right hip surgery, Mr. Blank suffered from discomfort and pain in his right hip. Due to the defective Pinnacle Device, Mr. Blank experienced four hip dislocations. He has also heard clicking noises coming from his right hip, experienced swelling and pain when in motion, followed by groin pain, inner thigh pain, pain when standing, and sitting. Mr. Blank also has high levels of metallosis.

57. On April 2, 2018, Mr. Blank's right hip Pinnacle implant was surgically removed due to the device's failure.

### D. The Defective Pinnacle Hip Implant Device And The Defendants' Conduct Caused Permanent Injuries And Substantial Damages to Mr. Blank

58. As a direct and proximate result of the failure of his defective Pinnacle Hip Implant Device and the Defendants' wrongful conduct, Mr. Blank sustained and continues to suffer economic damages (including medical expenses), severe and possibly permanent injuries, pain, suffering and emotional distress. As a result, Mr. Blank has sustained and will continue to sustain damages in an amount to be proven at trial, but which will far exceed the jurisdictional minimum of this Court.

**FIRST CAUSE OF ACTION**
**(Strict Product Liability)**
**Against All Defendants**

59. Plaintiffs incorporate by reference paragraphs 1 through 57 of this Complaint as if fully set forth here and further allege as follows:

///

60. Defendants designed, manufactured, promoted, distributed, marketed, and sold the Pinnacle Hip Implant Device.

61. At all times material hereto, the Pinnacle Hip Implant Device that was designed, manufactured, promoted, distributed, marketed, and sold by the Defendants was expected to reach, and did reach, prescribing physicians and consumers, including Mr. Blank, without substantial change in the condition in which it was sold.

62. At all times material hereto, the Pinnacle Hip Implant Device that was designed, manufactured, promoted, distributed, marketed, and sold by the Defendants was in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce. Such condition included, but is not limited to, one or more of the following particulars:

(a) When placed in the stream of commerce, the Pinnacle Hip Implant Device contained manufacturing defects, subjecting Mr. Blank and others to risks, including the risk that the acetabular component would not properly grow into the bone, causing the hip system to prematurely fail and requiring a complex, risky, and painful surgery to remove and replace the defective product;

(b) When placed in the stream of commerce, the Pinnacle Hip Implant Device contained unreasonably dangerous design defects and was not reasonably safe for the intended use, subjecting Mr. Blank and others to risks, including the risk that the acetabular component would not properly grow into the bone, causing the hip system to prematurely fail and requiring a complex, risky, and painful surgery to remove and replace the defective product;

(c) The Pinnacle Hip Implant Device was insufficiently tested; and

(d) The Pinnacle Hip Implant Device was not accompanied by adequate instructions and/or warnings to fully inform Mr. Blank or his physicians of the full nature or extent of the risks associated with its use.

63. Defendants knew or should have known of the dangers associated with the use of the Pinnacle Hip Implant Device, as well as the defective nature of the Pinnacle Hip Implant Device. Despite this knowledge, Defendants continued to manufacture, sell, distribute, promote and supply the Pinnacle Hip Implant Device so as to maximize sales and profits at the expense of the public health and safety.

64. Defendants' conduct was done in conscious disregard of the foreseeable harm caused by the Pinnacle Hip Implant Device and in conscious disregard for the rights and safety of consumers such as Mr. Blank.

65. Mr. Blank and his doctor used the DePuy Pinnacle Hip System as directed for its intended purpose.

66. At all times herein mentioned, the Pinnacle Hip Implant Device was defective, and Defendants knew that it was to be used by the user without inspection for defects therein. Moreover, neither Mr. Blank nor his physician knew or had reason to know at the time of the use of the subject products, of the existence of the aforementioned defects. Neither Mr. Blank nor his physicians could have discovered the defects in the Pinnacle Hip Implant Device through the reasonable exercise of care.

67. The Pinnacle Hip Implant Device had not been materially altered or modified prior to its implantation in Mr. Blank.

68. As a direct and proximate result of the failure of the defective Pinnacle Hip Implant Device, Plaintiffs suffered the injuries and damages as described herein.

**SECOND CAUSE OF ACTION**
**(Negligence)**
**Against All Defendants**

69. Plaintiffs incorporate by reference paragraphs 1 through 66 of this Complaint as if fully set forth here and further allege as follows:

70. Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing and distribution into the stream of commerce of the Pinnacle Hip Implant Devices, including a duty to insure that the Pinnacle Hip Implant Devices did not pose a significantly increased risk of adverse events.

71. Defendants failed to exercise reasonable care in the design, manufacture, testing, marketing and distribution into the stream of commerce of the Pinnacle Hip Implant Devices. Defendants knew or should have known that the Pinnacle Hip Implant Devices could fail early in patients, therefore giving rise to pain and suffering and debilitation, and therefore was not safe for use by Plaintiff.

///

72. Despite the fact that Defendants knew or should have known that the Pinnacle Hip Implant Devices could fail early in patients, therefore giving rise to pain and suffering and debilitation, Defendants continued to market the Pinnacle Hip Implant Devices as a safe and effective hip replacement systems.

73. In so doing, the Defendants failed to act as a reasonable manufacturer of hip implants.

74. As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered significant damages, including but not limited to physical injury, economic loss, and pain and suffering, and will continue to suffer such damages in the future.

### THIRD CAUSE OF ACTION
### (Breach of Implied Warranties)
### Against All Defendants

75. Plaintiffs incorporate by reference paragraphs 1 through 72 of this Complaint as if fully set forth here and further allege as follows:

76. Prior to the time that the Pinnacle Hip Implant Device was used by Mr. Blank, Defendants impliedly warranted to Mr. Blank and his physicians that the Pinnacle Hip Implant Device was of merchantable quality and safe and fit for the use for which it was intended.

77. Mr. Blank and his physicians were and are unskilled in the research, design and manufacture of the Pinnacle Hip Implant Device, and they reasonably relied entirely on the skill, judgment and implied warranty of Defendants in using the Pinnacle Hip Implant Device.

78. The Pinnacle Hip Implant Device was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

79. Defendants, by selling, delivering and/or distributing the defective Pinnacle Hip Implant Device to Mr. Blank breached the implied warranty of merchantability and fitness and caused Mr. Blank to suffer severe pain and emotional distress and incur medical expenses.

80. As a result of the aforementioned breach of implied warranties by Defendants, Plaintiffs suffered injuries and damages as alleged herein.

///

**FOURTH CAUSE OF ACTION**
**(Breach of Express Warranty)**
**Against All Defendants**

81. Plaintiffs incorporate by reference paragraphs 1 through 78 of this Complaint as if fully set forth here and further alleges as follows:

82. At all times herein mentioned, Defendants expressly warranted to Mr. Blank and Mr. Blank's physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that the aforementioned Pinnacle Hip Implant Device was safe, effective, fit and proper for its intended use.

83. In utilizing the aforementioned Pinnacle Hip Implant Device, Mr. Blank and his physicians relied on the skill, judgment, representations and foregoing express warranties of Defendants.

84. Said warranties and representations were false in that the aforementioned Pinnacle Hip Implant Device was not safe and was unfit for the uses for which it was intended.

85. As a result of the foregoing breach of express warranties by Defendants, Plaintiffs suffered injuries and damages as alleged herein.

**FIFTH CAUSE OF ACTION**
**(Breach of Song-Beverly Consumer Warranty)**
**Against All Defendants**

86. Plaintiffs incorporate by reference paragraphs 1 through 84 of this Complaint as if fully set forth here and further allege as follows.

87. Defendants manufactured the Pinnacle Hip Implant Device, an "assistive device" as defined by the Song Beverly Act, for the purpose of its eventual retail sale to buyers in California.

88. In February 2004, Defendants sold to Mr. Blank the Pinnacle Hip Implant Device.

89. Pursuant to California Civil Code section 1792, the sale to Mr. Blank of the Pinnacle Hip Implant Device was accompanied by Defendants' implied warranty that the Pinnacle Hip Implant Device was of merchantable quality.

///

COMPLAINT FOR DAMAGES AND JURY DEMAND

90. Defendants breached the implied warranty that the Pinnacle Hip Implant Device was merchantable because it was not fit for the ordinary purposes for which the goods are used. Consequently, Mr. Blank did not receive merchantable goods as impliedly warranted by Defendants.

91. At the time of the sale of the Pinnacle Hip Implant Device to Mr. Blank, Defendants had reason to know that the Pinnacle Hip Implant Device was required for a particular purpose and that Mr. Blank and his physicians were relying on Defendants' skill or judgment to select or furnish suitable goods.

92. Mr. Blank and his physicians relied upon Defendants' skill and judgment to select or furnish suitable goods.

93. Pursuant to California Civil Code section 1792.1, the sale to Mr. Blank of the Pinnacle Hip Implant Device was accompanied by Defendants' implied warranty that the Pinnacle Hip Implant Device was specifically fit for the particular needs of Mr. Blank

94. Defendants breached the implied warranty that the Pinnacle Hip Implant Device was specifically fit for the particular needs of Mr. Blank because the product had a defect that caused it to catastrophically fail when it was used as intended. This catastrophic failure occurred in May 2016.

95. As a direct and proximate result of Defendants' breach of the implied warranties described above, Plaintiffs sustained significant injuries and damages as described herein. Plaintiffs also incurred medical expenses and sustained incidental and consequential damages to be proven at trial.

96. Also as a direct result of Defendants' breach of the implied warranties described above, Plaintiffs have incurred and continue to incur attorneys' fees in an amount to be proven at trial.

**PRAYER FOR RELIEF**

THEREFORE, Plaintiffs demand judgment for the following:

1. Past and future medical and incidental expenses, according to proof;

2. Past and future general damages, according to proof;

3. Punitive and exemplary damages in an amount to be determined at trial;

4. Prejudgment and post judgment interest;

5. Attorneys' fees pursuant to the Song-Beverly Act and Code of Civil Procedure Section 1021.5;

6. Costs to bring this action; and

7. Such other and further relief as the court may deem just and proper.

Dated:   April 23, 2021                    HODES MILMAN, LLP

By: _____
Jeffrey A. Milman
Benjamin T. Ikuta
Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Dated:  April 23, 2021                     HODES MILMAN, LLP

By: _____
Jeffrey A. Milman
Benjamin T. Ikuta
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES AND JURY DEMAND